[Manegold, et al. v. Beavan.]

# Manegold, *et al. v.* Beavan.

## *Bill to Impeach a Decree for Fraud.*

(Decided November 7, 1914.  66 South. 448.)

1. *Judgment; Bill to Set Aside; Fraud; Limitation.*—Though the court by analogy applies the provisions of section 3178, Code 1907, to bills to impeach decrees for fraud, it will not extend it to embrace cases where the facts shown reasonably suffice to explain a delay of more than three years in filing a bill to impeach a decree for fraud.

2. *Limitation of Action; Time; Computation.*—Where, after attaining her majority, and after a final decree settling the guardianship, a ward continued to live in the family of her guardian, her uncle, and he continued to act for her in all business transactions, and she had no one to look to except him and his wife, her stepmother, the three years limit fixed by section 3178, Code 1907, made applicable by analogy to bills to set aside a decree for fraud, will not be applied, and a bill filed within less than a year after the discovery of the fraud was filed in time.

3. *Guardian and Ward; Settlement; Vacation; Fraud.*—Where the guardian of the ward was her uncle, and under the circumstances she entertained for him the same affection she would have entertained if he had been her father, and he deceived her, to her injury, in procuring a consent decree settling the guardianship, equity will grant relief by setting aside the decree.

4. *Equity; Bill; Multifariousness.*—The bill in this case examined and held to be multifarious in praying for relief on account of the execution by the ward of a certain conveyance, and not within the saving provision of section 3095, Code 1907, since the conveyance complained of does not come within the guardianship bond, and the claim arising therefrom cannot be treated as an asset of the ward in the hands of the guardian, although such transaction may be shown as corroborated evidence of the procurement of the decree by fraud.

APPEAL from Montgomery City Court.

Heard before Hon. ARMISTEAD BROWN.

Bill by Estelle Manegold Beaven against George Manegold and others, to impeach a decree for fraud. From a decree overruling demurrers to the bill, defendants appeal.  Reversed and remanded.

A general statement of facts will be found in the opinion.  The following are the paragraphs of the bill

referred to: (13) That at the time of the death of her said father, Joseph Manegold, oratrix was 11 years old. Her mother had been dead for six years. Her father, the said Joseph Manegold, had been married to Clara J. Manegold, oratrix's stepmother, for one month and two days. That Clara J. Manegold was then 23 years of age. That, prior to the death of said Joseph Manegold, his brother George Manegold, oratrix, and Clara J. Manegold had resided as one family at the residence of the said late Joseph Manegold, and that the three persons named continued to reside at the homestead set apart to said Clara J. Manegold and your oratrix, and that said George Manegold was married to said Clara J. Manegold on the 18th day of February, 1901, and that they continued to so reside at said residence thereafter. That oratrix recognized and felt toward Clara and George Manegold as she would have felt toward her parents. That she recognized them as her nearest relatives, lived with them for many years, and regarded them as her protectors. That she reposed implicit faith and confidence, and during all of her life, from the death of her father until she married, she relied absolutely upon their counsel and advice. That she was under their complete domination and influence, and that she was inexperienced in business affairs and knew nothing and understood nothing of the conduct of her affairs during her minority and during the time thereafter while she continued to reside with her guardian until she was married.

(14) That on October 20, 1908, the day following oratrix's twenty-first birthday, she was told by her uncle George Manegold that he desired her to sign certain papers, whereupon she went with him to the office of his attorney and, without the benefit of competent, independent advice, executed such papers as the said

George Manegold required her to sign. That she did not know at that time, and did not know thereafter, that she was executing receipts, releases, and discharges of the said George Manegold as her guardian, and that she did not know and understand the purport of said papers she had executed until March 14, 1913, when the same were explained to her by her attorney. That at that time the said sum of $14,357.15 was not in fact paid to her, and has not now been paid to her. That she had her husband write a letter to her uncle George Manegold, requesting a settlement of her affairs, and that he replied by saying that he had receipts in full from her for all funds which had come into his hands as her guardian.

(15) That on August 5, 1909, said George Manegold requested oratrix to execute another paper to him, and that she then executed said deed dated August 15, 1909, whereby she conveyed to Clara J. Manegold her interest in the residence at 605 Monroe street, for a recited consideration of $2,750. That said sum has never in fact been paid to her, and that she does not know, nor has she been able to ascertain, how her said guardian charged or credited the same against said deed of August 5, 1909, made by said Clara Manegold to oratrix, for the said Clara's interest in the real estate of Joseph Manegold, deceased. That oratrix executed said deed at the request of her said guardian because of her faith and confidence in him, and relied upon his counsel and advice in said transaction, and had no other counsel or advice relative thereto. That she does not know whether the said recited consideration was ever paid to said George Manegold as her guardian or not.

(16) Oratrix further avers that said receipt and said consent to said decree was obtained by said Manegold because of her faith and confidence in him, and that

the said George Manegold took advantage of orator's youth and inexperience in order to obtain the same, and that said receipt and consent decree constitute a fraud practiced upon your oratrix by said George Manegold, and that said decree was in fact a fraud upon this court.

DANIEL W. TROY, and FRANK STOLLENWERCK, for appellant.

HOLLOWAY & MCKENZIE, for appellee.

DE GRAFFENRIED, J.—We make the statement of the facts in this case from the allegations of the bill of complaint. The case is here on appeal from a decree of a court of equity overruling a demurrer to the bill of complaint.

The complainant is the daughter and only child of Joseph Manegold, who died in November, 1898. Complainant's mother died several years before the death of the father, and she was only 11 years old when her father died. Joseph Manegold married about a month before his death, and at the time of his death his widow, Clara J. Manegold, and complainant were the only members of his household. After his death the residence in which he died was set apart to said widow and minor daughter to live together in said home. They continued to live together in said home, and the relations of mother and daughter appear to have been fully established between them. Indeed, shortly after the death of her said husband, the said Clara J. Manegold qualified as the guardian of her said stepdaughter and assumed legal control of all of her pecuniary affairs. On the 18th day of February, 1901, the said widow, Clara J. Manegold, married George Manegold, the

brother of her deceased husband, and the uncle of her said stepdaughter and ward. The new husband established himself in the home of his deceased brother and became the head of his said deceased brother's family. He was thus not only the husband of the complainant's stepmother, the woman who occupied for her the place of mother, but he was a brother of her father and was her uncle by blood. He became the head of the household and was, out of respect to the double relationship, the recipient of her complete trust. She alleges, in fact, that she reposed the same confidence in him that a daughter is accustomed to repose in her own father, and that she entertained for him the same affection which a child is accustomed to entertain towards his or her own parents.

Some time in the latter part of the year 1906, it developed that her said guardian, the stepmother, had in her hands $12,316.46 of complainant's funds; that $3,-300 of this money was properly invested in notes secured by mortgages; and that the balance of the fund had been loaned by her to Joseph Manegold & Co., a mercantile firm composed of said George Manegold and the said Clara J. Manegold, without security. In other words, it then developed that the stepmother and guardian and her said husband, the uncle of complainant, were then using about $9,000 of complainant's funds in a mercantile business, and there had been taken for the ward no independent security therefor. Shortly after this development, the said Clara J. Manegold resigned her guardianship and delivered into the registry of the court the said mortgages and $12,316.46 in cash, which represented all with which, as guardian, the said widow, Clara J. Manegold, was chargeable. She was thereupon discharged as guardian, and George Manegold, the husband, was appointed guardian in her

stead. He executed a bond as guardian in the sum of $25,000, with the respondent the American Bonding Company of Baltimore as his surety thereon, and thereupon, on or about the 26th day of January, 1907, the said mortgages and the said $12,316.46 were turned over to him, and from that time the said George Manegold, as guardian, managed and controlled the estate of his said ward. Complainant reached her majority on the 19th day of October, 1908, and the day after she became of age, the said George Manegold obtained from her a receipt for $14,357.15. This receipt is in the following language: "Montgomery, Alabama, October 20/08. I, Estelle Manegold, having become of age on October 19, 1908, have had a settlement with George Manegold, as my guardian, and after having carefully inspected his acts and doings as such guardian, I hereby acknowledge receipt of ($14,357.15) fourteen thousand, three hundred and fifty seven and 15/100 dollars, in full of all moneys due me by him as such guardian. I also acknowledge possession being turned over to me of the following real estate, which has been in his hands, as guardian: Four stores on North Court street, being Nos. 106, 108, 124, and 126 North Court street; four houses and lots on Bell street; being Nos. 317, 319, 321, and 323 Bell street; one lot on the extension of Jeff Davis avenue; one lot in the rear of St. Margaret's hospital; and all in the city of Montgomery, Alabama, and one lot in West End, Birmingham, Alabama. And I do hereby release and discharge the said George Manegold and the sureties on his bond as guardian, from any and all liability due me by reason of said guardianship. [Signed] Estelle Manegold."

Subsequently, on August 6, 1909, a consent decree was rendered by the city court of Montgomery discharging the said George Manegold and the surety on his

bond, and by said decree the guardianship was finally settled. On file with this consent decree is the following paper: "I, Estelle Manegold, having become of age on October 19, 1908, and having received full settlement from George Manegold, do hereby consent that the court make the above decree."

The decree is based upon an account which was filed in said city court and that account is credited with $14,357.15 as having been paid by the guardian to the ward on October 20, 1908.

The complainant was married to W. H. Beaven on November 25, 1912, and moved from Montgomery to Birmingham, the place where she and her husband, since her marriage, have resided. This bill was filed on September 11, 1913, less than 12 months after complainant's marriage.

It appears from the bill of complaint that, from the time when her guardian married her stepmother until the marriage of complainant, she not only resided in the same house with said guardian and her stepmother, but that these two people possessed that full confidence and affection which they would have possessed if they had been her own father and mother. It further appears that on August 5, 1909, nine or ten months after complainant became of age, the said George Manegold, without any actual consideration, but upon a recited consideration of $2,750, procured her signature to a deed conveying to the stepmother complainant's remainder (dependent upon the life estate of the stepmother) in the homestead, and that, in fact, said $2,750 has never been paid to complainant.

The above general statement of the facts, when read in connection with the thirteenth, fourteenth, fifteenth and sixteenth paragraphs of the bill which the reporter will set out, will place the reader of this opinion in

possession of the facts of this case as they appear in this record and with the general purposes of the bill of complaint.

1. This bill is not a bill of review. It is a bill to impeach a decree for fraud. An application for leave to file a bill of review must be made within three years after the rendition of the decree (except in cases of infants and persons of unsound mind, who may apply within three years after the termination of their respective disabilities), but this provision of our code (see Code 1907, § 3178) does not, by its terms, extend to a bill to impeach a decree for fraud. This court has, by analogy, applied the above section to bills to impeach decrees for fraud.—*Gordon's Adm'r v. Ross & Wife,* 63 Ala. 363.

In the above case, however, the court plainly intimated that the above statute would not be extended so as to embrace cases where there resided in complainant an excuse which was reasonably sufficient to explain the delay. In that case the court said: "No reason is assigned, no excuse is offered, for the delay in filing the present bill; and by analogy it must be deemed barred."

In the instant case the bill of complaint shows that attainment by complainant of her majority and the rendition of the final decree settling the guardianship had no actual effect upon the relation of trust and confidence which the marriage of her guardian to her stepmother and his constant management of her business affairs as her guardian had created. After the attainment of her majority, and after the final decree which her guardian procured the court to render for the purpose of relieving his bondsmen of liability, he continued, as a matter of fact, the relations which the marriage and, by his appointment as guardian, the law it-

self created of trust and confidence, by continuing to act, in reality, as her guardian. The law can fix, and has arbitrarily fixed, a day when a young lady shall be, to the world, held to be responsible for her business engagements. It has not attempted to arbitrarily fix a day when a young lady, who continues to reside with a parent, who is her legal guardian, shall be held to have ceased to bestow upon him her affection and to repose in him the full measure of her confidence and trust. If the decree which is sought by this bill to be impeached was not procured by fraud (if it is to be held binding by the courts), then it has cut, like a knife, through the relations which the appointment of George Manegold, as the guardian of complainant, legally established between the parties to this bill. On the other hand, if the decree was procured by fraud, if this uncle (who presided over the only home which the complainant possessed until, by marriage, she acknowledged her allegiance and subservience to another man), during the period intervening between the attainment of complainant's majority and her marriage (the only period during which he possessed the opportunity to defraud complainant), so misused the affection which complainant possessed for him and the confidence which she reposed in him as to mislead her, without giving her the money, and without placing it within her untrammeled dominion and control, to sign and deliver to him a receipt for $14,357.15, and if, later, while she still remained an inmate of his home, and continued to bestow her affection upon him and to repose her confidence in him, he practiced upon her and the court the fraud shown by the bill, then such decree should be annulled and held for naught. If he procured the decree, not for the purpose of a bona fide settlement of a guardianship, but for the mere purpose

of changing the character of his liability from that of a guardian to that of an individual, and if he, in fact, continued the relationship (if he, in fact, continued in possession of her property and exercised, while she remained under his influence and dominion, that same character of influence over her which he had previously done, and which their intimate personal and blood relationship would imply), then there is not only no reason why the limitation of three years provided in the above section of the Code for obtaining leave to file bills of review should be applied to this bill, but the application of such a limitation would be to establish a rule which would in effect operate in a great many cases to deny relief to those who most need the protection of courts of equity, viz., those who are misled into acting to their own hurt through the abuse by others of their helplessness, and their love and trust. If the allegations of this bill are true, Mrs. Beaven, until she married, had no people to look to, except her stepmother and her uncle and guardian. The man of all others (indeed the only man) to whom she could naturally go, and to whom she did go, with all of her business affairs, was her said uncle and guardian, and we can see no reason which called for investigation by complainant of her business affairs until the day before her marriage, when her uncle gave her the passbook and told her that all the money she had left was $1,400.31. In this case there was no discovery of the fraud (and the bill fails to show any fact putting complainant on inquiry as to the fraud) until the day before her marriage. This was less than one year before the filing of the bill. Under the allegations of the complainant's bill (if what she says in the bill is true), then she certainly had one year after the day preceding her marriage within which to file this bill.

She filed it within less than a year. The bill, therefore, if it correctly states the facts, was filed in time. —*Willis v. Rice et al.,* 157 Ala. 252, 48 South. 397.

2. From what we have above said, it is evident that we are of the opinion that the bill of complaint contains equity. There are but few relations in life in which there can be such a complete surrender by one person to the dominance of another as naturally result from the relations which exist between a girl (a young lady) and her father. If a young lady cannot look to her father for protection (if she cannot accept as the very words of truth what he tells her), then the relations between such a young lady and her father are strange indeed. The bill in this case alleges that the complainant entertained for her uncle and guardian the same affection that she would have entertained for him if he had been her father. She was alone in the world, and he was, naturally, the one person to whom, until her marriage, she must look and upon whose words she must rely. She says in her bill that he took advantage of her and deceived her, to her hurt. If he did, he was guilty of a fraud, and a court of equity will give her relief. A court of conscience will not permit such a fraud upon one who is a peculiar object of its jurisdiction, and especially where the court itself has been used as one of the instruments to accomplish the fraud.—*Willis v. Rice et al., supra;* *McDonald v. Pearson,* 114 Ala. 630, 21 South. 534; *Rittenberry v. Wharton,* 176 Ala. 390, 58 South. 297; *Pickett v. Pipkin,* 64 Ala. 525; *Kyle v. Perdue,* 95 Ala. 584, 10 South. 103; *Cannon v. Gilmer,* 135 Ala. 302, 33 South. 659; *Martin v. Evans,* 163 Ala. 657, 50 South. 997; *Juzan v. Toulmin,* 9 Ala. 662, 44 Am. Dec. 448; *E. L. & C. P. Rogers, Jr., et al. v. Laura K. Brightman, Infra,* 66 South. 71.

We cite the above cases, not so much for the purpose of sustaining the propositions above announced (for the propositions announced hardly need authorities to sustain them) as for the purpose of pointing out authorities which may prove of service to counsel and the court in the further progress of this case.

3. This bill is, however, multifarious. The bill seeks relief against the guardian and the surety on his bond as guardian. During that period which, within the purview of his bond, the guardian had the right to exercise control and assert dominion over the property of his ward, George Manegold had not asserted control or even assumed possession of the ward's interest in remainder in the residence which was set apart to the widow and the ward as a homestead after the death of the ward's father. The fact that, after the ward had arrived at lawful age, he induced her, by virtue of his control and influence over her, to execute a conveyance to her stepmother upon an alleged consideration of $2,750 cannot be charged up, in this proceeding, as an act coming within the legal operation of his bond. This particular $2,750 cannot be treated as an asset of the ward which came into his hands as her guardian. In so far as this matter is concerned, a court of equity, upon proper appeal, may afford relief to complainant against her uncle and stepmother. It cannot, however, hold him for this matter, disassociated from any property of which he became possessed as her guardian, in his representative capacity as her guardian.—*Campbell v. Amer. Bonding Co.,* 172 Ala. 458, 55 South. 306; *Burdine v. Roper,* 7 Ala. 466; *Weeks v. Love,* 19 Ala. 25; *Godbold v. Roberts,* 20 Ala. 354.

It may be that this transaction may be shown as evidential, corroborative evidence of the fraud charged in the bill. It cannot, however, be made the basis for

a recovery against the guardian and his surety. The
bill in its present shape is therefore multifarious and
does not fall within the provisions of section 3095 of
the Code of 1907, which declares that: "A bill is not
multifarious which seeks alternative or inconsistent re-
lief growing out of the same subject-matter or founded
on the same contract or transaction, or relating to the
same property between the same parties."

The demurrer points out this defect in the bill, and
for that reason the demurrer should have been sus-
tained. The decree of the court below is therefore re-
versed, and the cause is remanded for further proceed-
ings in accordance with this opinion.

Reversed and remanded.

McCLELLAN, SAYRE, and GARDNER, JJ., concur.